NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____  :
                                 :
GARRY W. SIMMONS,                :
                                 :
            Plaintiff,           :     Civil No. 05-4763 (RBK)
                                 :
         v.                      :     **OPINION**
                                 :
COMMISSIONER OF SOCIAL           :
SECURITY,                        :
                                 :
            Defendant.           :
_____  :

**KUGLER,** United States District Judge:

This matter comes before the Court upon appeal by Plaintiff Garry W. Simmons ("Simmons"), pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").  For the reasons set forth below, the decision of the Commissioner will be affirmed.

## I.   Background and Procedural History

Simmons, born on October 25, 1955, alleges that he became disabled on September 2, 2002, due to several medical problems including obesity, degenerative joint disease of both knees, and diabetes mellitus.  (Admin. Rec. ("Rec.") at 17-18.)  In

addition, Simmons alleges arthritis of the hands, a torn rotator cuff in the left shoulder, hypertension and Gastroesophageal Reflux Disease ("GERD") medical problems. (Rec. at 18.)

Simmons is single and currently resides with his father and son in Camden, New Jersey. (Rec. at 18, 26.)  He earned a General Education Degree ("GED") and has a Bachelor's Degree in business administration. (Rec. at 17, 109.)  Until his injury, Simmons worked as a construction laborer. (Rec. at 18, 105-106, 203.)  For approximately fifteen years, he worked for private contractors on road repair projects. (Rec. at 203.)  This job required Simmons to do various tasks including shoveling, raking, lifting, and serving as a flagman. (Rec. at 108, 113, 114, 203.) Simmons alleges that he could no longer continue as a construction worker as of September, 2002, and has not engaged in any substantial gainful activity since that time. (Rec. at 17.)

Simmons filed an application for DIB and SSI on January 2, 2003, alleging high blood pressure, diabetes, and arthritis in both hands and knees rendered him unable to work. (Rec. at 184-86; Pl. Br. at 1.)  The Social Security Administration ("Administration") denied Simmons's application on June 10, 2003 (Rec. at 187.), and his request for reconsideration on October 3, 2003. (Rec. at 188.)  On October 14, 2003, Simmons filed a timely request for a review by an Administrative Law Judge ("ALJ") and was heard before ALJ Daniel W. Shoemaker, Jr. on September 29,

2004. (Rec. at 16.)

Judge Shoemaker denied Simmons's claims on March 25, 2005, concluding that Simmons "has not been under a 'disability', as defined in the pertinent provisions the Social Security Act, as amended, at any time through the date of this decision." (Rec. at 16.) Simmons requested review by the Appeals Council, but the Appeals Council denied his request on August 17, 2005, making the ALJ's determination the Commissioner's final decision. (Rec. at 5-7.) See Sims v. Apfel, 530 U.S. 103, 107 (2000) (citing 20 C.F.R. §§ 404.900(a)(4)-(5), 404.981, 422.210(a)).  Simmons filed the present action before this Court on October 3, 2005.

   **A.   Administrative Hearing**

Simmons was the sole witness at the administrative hearing before Judge Shoemaker.  He testified that he became disabled on September 2, 2002 after he "passed out" due to his high glucose levels associated with diabetes mellitus.  (Rec. at 202.) Simmons was diagnosed with diabetes three years prior to this incident.  (Rec. at 208.)  Since the date of the alleged onset of disability, Simmons reported current systems of fatigue and weight fluctuation, which he attributed to his feelings of "doing nothing" and "low-esteem."  (Rec. 208-209.)  To treat his diabetes, he takes three pills a day, and monitors his blood sugar on most days. (Rec. at 201.)

In addition to treatment for his diabetes, Simmons also

reported receiving treatment for a tear in his left shoulder. (Rec. at 204.)  Moreover, Simmons testified that he takes ibuprofen for arthritic pain, and applies Icy-Hot and similar ointment to his hands and knees.  (Rec. at 206, 211, 214.)  He also testified that he squeezes a soft ball and rubs his hands to relieve cramping.  (Rec. at 211.)  While Simmons does not take narcotic pain medication, he reported occasionally wearing a knee brace to deal with knee pain and swelling.  (Rec. at 205, 206, 214.)  Simmons's knee problems stem from a knee operation he had performed thirty years earlier when doctors "removed the cartilage" leaving "just bone-on-bone."  (Rec. at 205.)  He indicated that he was told by his treating doctor, Dr. Pamela Turnbo, that he is too young for a knee replacement.  (Rec. At 206.)

Because of his various medical conditions, Simmons testified that he is able to sit for approximately two hours at a time, and stand for fifteen to twenty minutes.  (Rec. 207.)  He frequently stands after intervals of sitting to keep his legs "a little loose."  Id.  He walks "pretty good . . . maybe two or three days out of the week" but does not "walk too far."  Id.  Simmons believes that he cannot do a sit down job because of daily hand cramping, which also hinders his ability to drive. (Rec. at 210, 211.) Nevertheless, Simmons testified that he would be "willing to try a job" that would allow him to take 15 minute breaks after

4

every two hours of sitting.  (Rec. at 216.)

Regarding Simmons's daily activities, he testified that he and his son share the food shopping and cooking responsibilities. (Rec. at 212-13.)  However, his son is responsible for the laundry and for helping Simmons shave. (Rec. at 211-12.)  On most days Simmons reported that he sits on the couch, watches TV, and does "much of nothing."  (Rec. at 212.)  He has no hobbies and is not involved in any recreational activities.  (Rec. at 213.)

**B.    Treatment History of Physical Impairment**

Simmons's earliest medical records indicate that he was treated at the emergency room at Pennsylvania Hospital on December 31, 2002 after complaining of dizziness and giddiness. (Rec. at 131, 133.)  During this visit, he admitted "medical and dietary noncompliance" by skipping a few doses of his medication and by consuming pie, ice cream, and a "significant portion of rum." Id.  Simmons's examination revealed an elevated blood sugar level and elevated blood pressure.  (Rec. at 131.)  His diagnosis included diabetes mellitus without complication, Type II.  (Rec. at 133.)

On June 11, 2002, Simmons again returned to the emergency room at Pennsylvania Hospital, complaining of numbness in his left arm.  (Rec. at 143.)  Examination confirmed reduced sensation in his left arm, but motor strength and deep tendon reflexes were unaffected.  (Rec. at 143, 145.)  His diagnosis

included disturbance of skin sensation, essential hypertension, and diabetes mellitus without complication.  (Rec. at 141.)

Medical records dated from January 2002 through January 2003 from Cooper Hospital/University Medical Center detail Simmons's treatment by Drs. Fuller and Turnbo.  (Rec. at 152-63.)  Dr. Fuller's records indicate that Simmons presented on January 18, 2002, complaining of dizziness and back pain.  (Rec. at 163.)  During his examination, he admitted that he had eaten ice cream, pie, potato chips, french fries and hot dogs the previous night.  Id.  The examination revealed that Simmons had gained eight pounds since August 2001 and had an elevated blood glucose level of 217.  Id.  In addition, Simmons blood pressure reading was 160/110.  Id.  Dr. Fuller noted that plaintiff's diet was "horrendous."  Id.

Simmons sought treatment during a nurse's visit on March 29, 2002, stating that he needed medication.  (Rec. at 162.)  His examination indicated a blood glucose reading of 331 and a blood pressure reading of 154/98.  Id.  As of October 17, 2002, however, Dr. Fuller described Simmons's blood sugar as "stable" at 149 and his blood pressure as "great" at 112/80.  (Rec at. 160.)  Additionally, Dr. Fuller's noted a normal cardiovascular exam, clear lungs and no edema.  Id.  Moreover, Dr. Fuller noted crepitation in Simmons's left knee absent effusions.  Id.  He opined that Simmons has degenerative joint disease ("DJD"), and

6

that Simmons's work performance was limited by knee pain.  Id.

     Also on October 17, 2002, Simmons underwent a series of x-rays of his hands and knees.  (Rec. at 158-59.)  The x-rays revealed mild DJD in several fingers and more severe DJD in his left knee.  Id.  At the order of Dr. Pamela Turnbo, Simmons underwent a follow-up MRI of his left knee in February, 2003, which revealed severe tricompartmental osteoarthritis, chronic anterior cruciate ligament tear, and posterior heterotopic ossification.  (Rec. at 164.)

     Simmons last record of treatment with Dr. Fuller is on January 10, 2003 when he presented complaining of total body pain, fatigue, and knee pain.  (Rec. at 152.)  His examination revealed a blood glucose reading of 104, a blood pressure reading of 132/90, and normal hearing and lungs.  Id.  Crepitation was present in both knees, but no effusion was present.  Id.

     At the request of the Commissioner, Dr. Steven Klein conducted a consultative examination of Simmons on May 19, 2003.  (Rec. at 165-67.)  At the time of the examination, Simmons weighed 276 pounds and had a blood pressure reading of 120/90.  (Rec. at 165.)  No complications with Simmons's diabetes mellitus were noted.  (Rec. at 165-66.)  However, Dr. Klein's examination revealed that the circumference of Simmons's left knee was one-half inch larger than the right, and joint line tenderness existed in Simmons's left knee.  (Rec. at 166.)  Crepitants were

present in both knees.  Id.  Examination further revealed a full range of motion in Simmons's cervical and lumbar spine, and upper extremities.  Id.  Moreover, grip strength was good bilaterally, and no muscle weakness was noted.  Id.  Dr. Klein noted that Simmons's ability to do fine and gross manipulation was within normal limits.  Id.  Additionally, Dr. Klein observed that Simmons walked with a mild antalgic gait, but added that Simmons does not require a hand-held assistive device for ambulation. Id.

A state agency medical consultant, Dr. A. Kisch, reviewed the record and provided a functional assessment on June 3, 2003. (Rec. at 169-76.)  Dr. Kisch concluded that Simmons could occasionally lift and/or carry up to twenty pounds, and frequently lift and/or carry up to ten pounds.  (Rec. at 170.) He further concluded that Simmons could stand and/or walk two to four hours in an eight-hour workday, and sit approximately six hours.  Id.  Furthermore, Dr. Kisch noted Simmons's unlimited ability to push and/or pull and lack of manipulative, visual, and communicative limitations. (Rec. at 170, 172-73.)  Nevertheless, he acknowledged Simmons's postural limitations, including limitations in climbing, balancing, stooping, kneeling, crouching and crawling.  (Rec. at 171.)  He also recommended that Simmons avoid concentrated exposure to hazards.  (Rec. at 173.)

On September 16, 2003, Dr. Pamela Turnbo, Simmons's treating

doctor, provided a letter and functional assessment of her patient. (Rec. at 177-80.)  In her letter, Dr. Turnbo noted that she has treated Simmons for over six years and confirmed his medical history of hypertension, non-insulin dependant diabetes mellitus, and severe DJD of both knees (Rec. at 177.) Additionally, Dr. Turnbo indicated that Simmons has a history of DJD in his lower back.  Id.  She stated, "[O]ver the years, I have noticed that [Simmons] has had significant limitations in his ambulation."  Id.  She further opined that Simmons is not able to return to his previous employment in construction, but would benefit from a total bilateral knee replacement.  Id.

Dr. Turnbo completed her functional analysis of Simmons on September 15, 2003, however, in this assessment she provided no opinion on Simmons's ability to sit, stand or walk.  (Rec. at 178.)  She opined that Simmons can occasionally lift and/or carry up to twenty pounds, and frequently lift and/or carry up to ten pounds.  Id.  She also concluded that Simmons is capable of using his hands for repetitive action such as simple grasping, pushing and pulling, and fine manipulations.  Id.  Nonetheless, Dr. Turnbo offered that Simmons is unable to use both feet for repetitive movements, and that, while Simmons can bend, he cannot stoop, squat, crawl or climb.  Id.  She added that Simmons is moderately restricted in his exposure to changes in temperature and humidity, and exposure to dust, fumes and gases.  Id.  She

noted that Simmons should not drive automotive equipment and that Simmons is limited "mainly in [his] lower extremities due to severe DJD." Id.

Dr. Turnbo also completed a Clinical Assessment of Pain in which she opined that Simmons experiences pain to such an extent as to be distracting to adequate performance of daily activities at work. (Rec. at 179.) She noted that Simmons would experience greatly increased pain to such a degree as to cause distraction from the task or even total abandonment of the task. Id. Furthermore, she stated that Simmons's medication produces some side effects, which limit the effectiveness of work duties or the performance of such everyday tasks. Id. She concluded that Simmons will experience little improvement, his pain will increase, and that treatments have no appreciable impact. (Rec. at 180.) She supported her findings by noting that Simmons had received injections which only provided temporary relief. Id.

Additional medical evidence was submitted for the record subsequent to the administrative hearing, including clinical notes from an unknown source dated June 8, 2004 and August 30, 2004. (Rec. at 181-182.) The June 8, 2004 record states that Simmons "look[ed] good" with a blood pressure reading of 110/76 and a blood glucose level of 116. (Rec. at 182.) The August 30, 2004 clinical note includes a "good" blood pressure reading of 136/70, and a finger blood sugar reading of 203. (Rec. at 181.)

10

The August examination revealed normal lungs and heart, normal sensation, and normal motor strength in all four of plaintiff's extremities.  Id.

### C.   Judge Shoemaker's Opinion

In determining that Simmons is not disabled for the purpose of the Social Security Act ("SSA"), Judge Shoemaker first determined that Simmons had not engaged in any substantial gainful activity since his alleged onset date of September 2, 2002.  (Rec. at 17.)  He then found that Simmons's conditions of obesity, degenerative joint disease of both knees, and diabetes mellitus constitute "severe" impairments within the meaning of the SSA.  Id.  Despite these impairments, however, Judge Shoemaker, in evaluating Simmons's residual functional capacity, found:

> [T]he claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible in light of the claimant's own description of his activities and lifestyle; the degree of medical treatment required; discrepancies between the claimant's assertion and information contained in the documentary reports; the claimant's demeanor at hearing; the reports of the treating and examining practitioners; the medical history; the findings made on examination; the claimant's assertions concerning his ability to work.

(Rec. at 19.)  Judge Shoemaker determined there was no evidence of severe problems of arthritis of the hands causing significant functional restrictions and that Simmons is able to perform fine

complex manipulative tasks.  (Rec. at 23.)   Similarly, he found that there is no evidence of a torn rotator cuff or GERD, and that Simmons's hypertension is well-controlled.  Id.  Overall, Judge Shoemaker concluded that, while Simmons cannot perform his past relevant work, he "can perform a wide range of sedentary work tasks."  (Rec. at 24.)  He based his conclusion upon finding that Simmons "possesses the residual functional capacity to perform sedentary tasks, where he could occasionally lift and carry [20][1] pounds, frequently lift and carry 10 pounds, sit for 6 hours out of a normal 8 hour workday, and stand 2 to 4 hours out of a normal 8 hour workday."  (Rec. at 23.)

## II.  Standard of Review

This Court's review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

---

[1]While the "Findings" section of Judge Shoemaker's opinion states that Simmons can occasionally lift and carry 10 pounds, the remainder of the opinion makes clear that this is a typographical error, and that he meant to write that Simmons could occasionally lift and carry 20 pounds.  This error is evident when read in conjunction with Judge Shoemaker's finding that Simmons can frequently (as opposed to occasionally) lift and carry 10 pounds.

conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000)
(quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)). If
the Commissioner's determination is supported by substantial
evidence, the Court may not set aside the decision, even if the
Court "would have decided the factual inquiry differently."
Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing
Hartranft, 181 F.3d 358, 360 (3d Cir. 1999)); see also Williams
v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (holding that a
district court may not "weigh the evidence or substitute its
conclusions for those of the fact-finder") (citing Early v.
Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

Nevertheless, the reviewing court must be wary of treating
"the existence vel non of substantial evidence as merely a
quantitative exercise" or as "a talismanic or self-executing
formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114
(3d Cir. 1983) ("The search for substantial evidence is thus a
qualitative exercise without which our review of social security
disability cases ceases to be merely deferential and becomes
instead a sham."). The Court must set aside the Commissioner's
decision if the Commissioner did not take into account the entire
record or failed to resolve an evidentiary conflict. See
Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997)
("[U]nless the [Commissioner] has analyzed all evidence and has
sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)).  Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence."  Wallace v. Sec. of Health and Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d 110, 114 (3d Cir. 1983)).

**III. Analysis**

The Commissioner conducts a five step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity." Such activity bars the receipt of benefits. 20 C.F.R. § 404.1520(a).  The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the Commissioner finds that the claimant's condition is severe, the Commissioner evaluates whether it meets or equals a listed

impairment. 20 C.F.R. § 404.1520(d). If the condition is
equivalent to a listed impairment, the claimant is entitled to
benefits; if not, the Commissioner continues on to step four to
evaluate the claimant's residual functional capacity ("RFC") and
determine whether the RFC would entitle the claimant to return to
his "past relevant work." 20 C.F.R. § 404.1520(e). The ability to
return to past relevant work precludes a finding of disability.
If the Commissioner finds the claimant unable to resume past
relevant work, the burden shifts to the Commissioner to
demonstrate the claimant's capacity to perform work available "in
significant numbers in the national economy." Jones, 364 F.3d at
503 (citing 20 C.F.R. § 404.1520(f)).

　　　Simmons argues that the ALJ (1) failed to properly determine
the plaintiff's residual functional capacity in step five of the
Commissioner's inquiry, and (2) failed to give appropriate
probative value to relevant medical opinions.

### A.   Residual Functional Capacity Assessment

　　　The term "residual functional capacity" ("RFC") is defined
in the Commissioner's regulations as the most an individual can
still do after considering the physical and/or mental limitations
affecting his ability to perform work-related tasks.  20 C.F.R. §
416.945.  In the present matter, it is necessary to ascertain
whether the ALJ's assessment of Simmons's residual functional
capacity — finding him capable of lifting up to 20 pounds

occasionally, 10 pounds frequently, sitting for six hours and standing for two hours in an eight hour workday, and unlimited push/pull activity — was supported by substantial evidence.

On this issue, Simmons first contends that the ALJ failed to offer a complete assessment of his RFC.  Although the Court must affirm the ALJ's RFC determination if it is supported by substantial evidence, "[e]vidence is not substantial if the Commissioner failed to consider all relevant evidence or failed to resolve conflicts created by counter-veiling evidence or overwhelmed by other evidence." Gifford v. Barnhart, 129 Fed. Appx. 704, 706 (3d Cir. 2005).  Consequently, although the ALJ may "weigh medical evidence and choose between conflicting accounts," Torres v. Barnhart, 139 Fed.Appx. 411 (3d Cir. 2005) (citing Williams, 970 F.2d at 1187), the ALJ must actually consider all of the evidence and provide his reasons for crediting certain portions of the record over others. Oh v. Barnhart, 68 Fed. Appx. 370, 374 (3d Cir. 2003).

In this instance, the ALJ's opinion is adequate on its face. To determine Simmons's RFC, Judge Shoemaker weighed Simmons's subjective allegations of disability against information provided in the medical record and seven other factors relating to the alleged disability.[2]  (Rec. at 18-19.)  Judge Shoemaker detailed

---

[2]   These seven factors include:
1.  The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
2.  Precipitating and aggravating factors

Simmons's medical history beginning with his treatment in the
emergency room of Pennsylvania Hospital on December 31, 2000
through his treatment with Dr. Fuller.  (Rec. at 19.)
Furthermore, Judge Shoemaker considered Simmons's evaluation with
Dr. Klein and subsequent reports issued by a state agency
reviewing physician and Dr. Turnbo.  (Rec. at 20-21.)  Following
his review of Simmons's medical record, Judge Shoemaker decided
to place substantial weight upon the evaluation of Dr. Klein in
his assessment of Simmons's physical limitations.  (Rec. at 21.)

Dr. Klein considered Simmons's allegations of hypertension,
Type II diabetes, arthritis of the hands and swelling of the
knees.  (Rec. at 21-22.)  Based on his findings and supported by
the findings of Simmons's evaluating state agency physician and
several findings by Dr. Turnbo, Judge Shoemaker concluded that
none of Simmons's alleged conditions were so severe as to
preclude him from performing a minimum amount of standing and
walking tasks required to perform a full, wide, or significant
range of sedentary work tasks.  Id.  The only specific conflicts
with Judge Shoemaker's findings are Dr. Turnbo's finding that
"pain is present to such and extent as to be distracting to

_____

3.  Type, dosage, effectiveness, and adverse side-effects of
    any pain medication
4.  Treatment, other than medication, for relief of pain;
5.  Functional restrictions; and
6.  The claimant's Daily activities; and
7.  Any measures other than treatment individual uses or
has used to relieve pain or other symptoms
20 C.F.R. §§ 404.1559. 416/929. SSR 96-7

17

adequate performance of daily activities or work" and Simmons's own testimony. (Rec. at 179, 196-218.) However, Judge Shoemaker adequately resolved the conflict posed by Dr. Turnbo's pain assessment through deciding to afford it little weight because it was internally inconsistent with her other findings and was not supported in clinical notes or by substantial evidence in the record. (Rec. at 21.) Moreover, because Judge Shoemaker found that Simmons's testimony lacked credibility, his complaints of subjective symptoms did not suffice to further limit his RFC. Consequently, there is no credible evidence indicating that Simmons's alleged conditions limits his RFC such that he cannot perform sedentary work.

Simmons further contends that the ALJ failed to give adequate weight to his non-severe impairments. In making his assessment of RFC, "the ALJ must consider the combined effect of multiple impairments, regardless of their severity." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000); 20 C.F.R. § 404.1523. In order for the ALJ to find that the claimant's severe and non-severe impairments impacted his RFC, there must be evidence that these conditions actually imposed some limitation on the claimant. Hartranft, 181 F.3d 359. Where the claimant's doctors are aware of the claimant's alleged condition and the ALJ adopted the conclusions of these doctors, such adoption may constitute "a satisfactory if indirect

18

consideration of that condition." <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 553 (3d Cir. 2005).  In such a situation, it is presumed that the condition was taken into account, even if it was not explicitly discussed by the ALJ.

To assess Simmons's physical limitations, Judge Shoemaker relied substantially upon the evaluation by Dr. Steven Klein (Rec. at 21-23.)  Dr. Klein considered Simmons's alleged conditions of hypertension, diabetes, and arthritis of the hands and knees, and found no evidence of limitations that would establish disability.  <u>Id.</u>  Thus, even if the ALJ did not explicitly discuss both Simmons's severe and non-severe impairments when determining his RFC, it is presumed that the ALJ took them into account based on his reliance on Dr. Klein's assessment.

Nevertheless, Judge Shoemaker did explicitly consider Simmons's severe and non-severe impairments during his evaluation of RFC.  Specifically, Judge Shoemaker made direct reference to Simmons's non-severe impairments of arthritis in his hands, GERD, torn left shoulder rotator cuff, and hypertension.  (Rec. at 22.) The ALJ noted the results of Simmons's hand x-rays and noted that Dr. Turnbo, a treating source, found Simmons to be able to use his hands for repetitive action, including grasping, pushing, pulling and fine manipulations.  (Rec. at 21.)  Judge Shoemaker also noted that the record was absent any indication that Simmons

19

had been diagnosed with GERD or a torn left shoulder rotator cuff. (Rec. at 22.) Moreover, Judge Shoemaker acknowledged Simmons's hypertension and stated that the "various reports notes that the condition is well controlled with medication." (Rec. at 22.) Finally, the ALJ considered the impact of Simmons's subjective allegations of pain an other symptoms on his ability to work. (Rec. at 18-19, 22.) Because Judge Shoemaker found that Simmons's testimony lacked credibility, his complaints of subjective symptoms did not suffice to further limit his RFC. Consequently, Judge Shoemaker accorded adequate weight to Simmons's non-severe impediments in determining his RFC.

Accordingly, Judge Shoemaker did not fail to offer a complete assessment of Simmons's RFC or account for Simmons's non-severe impairments when assessing Simmons's RFC. No credible medical evidence suggests that Simmons's alleged conditions impose any limitations beyond those in the RFC determination. Likewise, there is no credible evidence indicating that Simmons's alleged hypertension, diabetes, and arthritis of the hands and knees limits his RFC such that he cannot perform sedentary work. Accordingly, the ALJ's RFC determination is supported by substantial evidence.

## B.   Probative Value of Relevant Medical Opinions

Simmons also argues that Judge Shoemaker failed to give appropriate probative value to relevant medical opinions,

20

particularly the opinion of Dr. Pamela Turnbo.

According to the Commissioner's regulations, a medical opinion must be supported by clinical and laboratory evidence, and be consistent with other substantial evidence of record to be given controlling weight.  20 C.F.R. §§ 404.1527(a), 416.927(a); SSR 96-2p.  An ALJ may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion." Humphreys v. Barnhart, 127 Fed. Appx. 73, 75 (3d Cir. 2005).  However, an ALJ may "afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186 F.3d at 429 (citations omitted).  Furthermore, "an ALJ may reject a physician's opinion on the basis of contradictory or inconsistent evidence." Zappala v. Barnhart, No. 05-5252, 2006 U.S. App. LEXIS 24880, at *5 (3d Cir. Aug. 18, 2006) (citing Plummer, 186 F.3d at 429).

In the present matter, Judge Shoemaker did not accord controlling weight to the opinion of Dr. Turnbo because her report was incomplete, internally inconsistent, and inconsistent with substantial evidence presented in the record.  (Rec. at 21.) Specifically, Judge Shoemaker notes:

> "One the one hand, she finds the claimant could
> frequently lift and carry weights of up to 10 pounds,
> occasionally lift and carry weights up to 20 pounds and

21

> has the ability to perform simple grasping, pushing,
> pulling and fine manipulative tasks and is also able to
> frequently reach above shoulder level. At the same time,
> the doctor indicated that claimant's pain was so severe
> that it would preclude him from performing daily
> activities of work.

Id. He also places significance upon Dr. Turnbo's failure to complete the section regarding sitting, standing, or walking capacities. As a result, Judge Shoemaker afforded Dr. Turnbo's opinion of disability little weight in comparison to other evidence presented. Id.

Because Judge Shoemaker did not base his decision on the importance of Dr. Turnbo's opinion on his own credibility judgement, speculation, or lay opinion, but rather on basis of more credible evidence in the record, his decision is sound. In addition to being internally inconsistent, Dr. Turnbo's report was not supported by any of her clinical notes, and several of her findings were inconsistent with other clinical and laboratory evidence presented in the record. Similarly, the findings of Dr. Klein and the state agency medical consultant, Dr. Kisch, were inconsistent with those of Dr. Turnbo.

Furthermore, Dr. Turnbo's findings are not wholly inconsistent with Judge Shoemaker's conclusion regarding Simmons's disability. Judge Shoemaker agreed with Dr. Turnbo's assessment that Simmons could frequently lift and carry 10 pounds and occasionally lift and carry weights of up to 20 pounds.

(Rec. at 21, 23.)  He also agreed with Dr. Turnbo's assessment regarding Simmons's use of his hands for repetitive action.  Id. Likewise, Judge Shoemaker agreed with Dr. Turnbo's conclusion that Simmons could not return to his previous heavy unskilled work tasks as a construction laborer.  Id.  Consequently, even though Judge Shoemaker did not afford substantial weight to Dr. Turnbo's assessment, her assessment does not necessarily preclude Judge Shoemaker's conclusion that Simmons is capable of performing a range of sedentary work.

Therefore, based upon Judge Shoemaker's reasoning as adequately expressed in his opinion, he afforded proper probative weight to Dr. Turnbo's findings.  His conclusions are grounded in the record and supported by substantial evidence.


**IV.  Conclusion**

For the foregoing reasons, this Court will affirm Judge Shoemaker's decision.  The accompanying Order shall issue today.



Dated: October 31, 2006        s/ Robert B. Kugler
                                ROBERT B. KUGLER
                                United States District Judge

23